UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION


J.R.,

       Plaintiff,

v.                                            4:11cv417-WS

MICHAEL HANSEN, in his
Official Capacity as Director of
the Agency for Persons with
Disabilities,

       Defendant.

_____

<u>ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT</u>

The plaintiff in this case mounts a constitutional challenge to a Florida statute, section 393.11, that sets forth the state's scheme for involuntarily admitting mentally retarded persons to residential services provided by the Agency for Persons with Disabilities ("APD").  The plaintiff contends that the statute violates the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

Before the court at this time are the parties' cross-motions for summary judgment (docs. 41 & 44) and their respective responses (docs. 46 & 47) thereto.  The parties have been advised (doc. 63) that the motions would be taken under consideration as of a date certain.  Because the court concludes that section 393.11 comports with the constitutional requirements of due process, the court grants the defendant's and denies the plaintiff's motion for summary judgment.

## I.  SECTION 393.11

Chapter 393 of the Florida statutes, entitled "Developmental Disabilities," governs the treatment and services provided for persons with developmental disabilities, including mental retardation.  In enacting Chapter 393, the Florida Legislature recognized that community-based services, as opposed to institutional placements, would "enable individuals with developmental disabilities to achieve their greatest potential for independent and productive living, enable them to live in their own homes or in residences located in their own communities, and permit them to be diverted or removed from unnecessary institutional placements."  Accordingly, the Legislature declared that, "in developing community-based programs and services for individuals with developmental disabilities, private businesses, non-for profit corporations, units of local government, and other organizations capable of providing needed services to clients in a cost-efficient manner shall be given preference in lieu of operation of programs directly by state agencies.  Id. at § 393.062.

Section 393.11 provides that "[w]hen a person is mentally retarded and requires involuntary admission to residential services provided by the agency, the circuit court of the county in which the person resides shall have jurisdiction to conduct a hearing and enter an order involuntarily admitting the person in order that the person may receive the care, treatment, habilitation, and rehabilitation which the person needs."  Fla. Stat. § 393.11(1).  If, as in this case, criminal charges are dismissed against a defendant found to be incompetent due to mental retardation, involuntary admission to residential services can be initiated by petition or motion filed by APD, the state attorney, or by counsel for the person needing services.  § 916.303(2).

Upon receiving such a petition or motion, the circuit court must appoint an examining committee comprised of "no fewer than three disinterested experts who have demonstrated to the court an expertise in the diagnosis, evaluation, and treatment of persons with mental retardation." § 393.11(5)(b).  After examining the person being considered for involuntary admission, the committee must file a written report with the court, explicitly documenting the extent to which the person meets the criteria for involuntary admission.  § 393.11(5)(e).  Once the committee's written report is filed, a hearing for involuntary admission is conducted.  § 393.11(7).  The person with mental retardation is entitled to be represented by counsel at "all stages of the judicial proceeding."  § 393.11(6)(a).  "If the attorney, during the course of his or her representation, reasonably believes that the person with mental retardation cannot adequately act in his or her own interest, the attorney may seek the appointment of a guardian ad litem."  § 393.11(6)(b).

An order of involuntary admission to residential services may be entered provided the circuit court finds that:

1. The person is mentally retarded . . . ;

2. Placement in a residential setting is the least restrictive and most appropriate alternative to meet the person's needs; and

3. Because of the person's degree of mental retardation . . . , the person:

a. Lacks sufficient capacity to give express and informed consent to a voluntary application for services pursuant to s. 393.065 and lacks basic survival and self-care skills to such a degree that *close supervision and habilitation in a residential setting is necessary* and, if not provided, would result in a real and present threat of substantial harm to the person's well-being; or

b. Is likely to physically injure others *if allowed to remain at liberty.*

§393.11(8)(b) (emphasis added).

Within 45 days of its receipt of an order admitting a person, or "client," to residential services, APD must provide the circuit court with a copy of a "support plan" outlining the treatment and rehabilitative programs prescribed for the client and documenting that the client "has been placed in the most appropriate, least restrictive and cost-beneficial residential setting." § 393.11(8)(e).  "The client, if competent, the client's parent or guardian, or, when appropriate, the client advocate,"[1] must be consulted in the development of the support plan. § 393.0651.  "The ultimate goal of each plan, whenever possible, shall be to enable the client to live a dignified life in the least restrictive setting, be that in the home or in the community."  Id.

When deciding the appropriate placement for a client, APD must consider placements in the following order:

(a) Client's own home or the home of a family member or direct service provider.

(b) Foster care facility.

(c) Group home facility.

(d) Intermediate care facility for the developmentally disabled.

(e) Other facilities licensed by the agency which offer special programs for people with developmental disabilities.

(f) Developmental disabilities center.

---

[1]  A client advocate may be appointed by the support planning team for a client who is a minor or for a client who is not capable of express and informed consent when: (a) the parent or guardian cannot be identified; (b) the whereabouts of the parent or guardian cannot be discovered; or (c) the state is the only legal representative of the client.  § 393.0651(4).

§ 393.0651(5).[2]  The client (or client advocate) and the administrator of the facility to which placement is proposed must be consulted in determining the appropriate placement.  § 393.0651(5).

Support plans are required to be revised annually, following review of a client's progress in achieving the objectives set forth in his or her plan.  § 393.0651(7).  The client (or client advocate) must be consulted during the annual review and revision of the support plan.  Id.  Like the initial support plan, each revised plan must include "the most appropriate, least restrictive, and most cost-beneficial environment for accomplishment of the objectives for client progress."  § 393.0651.

The circuit court that issues the initial order for involuntary admission to residential services "shall have continuing jurisdiction to enter further orders to ensure that the person is receiving adequate care, treatment, habilitation, and rehabilitation, including psychotropic medication and behavioral programming."  § 393.11(11).  Upon request, the admitting court may transfer the continuing jurisdiction to the court where a client resides if that place is different from where the original involuntary admission order was issued.  Id.  Only the circuit court has the authority to release a person from an order for involuntary admission to residential services.  Id.

_____

[2]  A "foster care facility" means a residential facility licensed under chapter 393 which provides a family living environment including supervision, the capacity of which may not be more than three residents.  § 393.063(15).  A "group home facility" means a residential facility licensed under chapter 393 which provides a family living environment including supervision, the capacity of which shall be at least 4 but not more than 15 residents.  § 393.063(16).  An "intermediate care facility for the developmentally disabled" means a residential facility licensed and certified pursuant to part VIII of chapter 400.  § 393.063(20).  A "developmental disabilities center" means a state-owned and state-operated facility (once known as a "Sunland Center").  § 393.063(10).

If a developmentally disabled defendant in a criminal case is found to need involuntary residential services but "there is a substantial likelihood that the defendant will injure another person or continues to present a danger of escape," and if services in community residential facilities or other community settings are judged to be inappropriate for that defendant, the committing court may continue the defendant's placement in a secure facility in lieu of admission to non-secure residential services. § 916.303(3).  Any secure placement so continued must be reviewed by the court at least annually at a hearing.  Id.

Unlike section 916.303(3), section 393.11 does not provide for periodic judicial review of persons involuntarily admitted to non-secure residential services.  The admitted person may, however, file a petition for a writ of habeas corpus at any time and without notice "to question the cause, legality, and appropriateness of the person's involuntary admission."  § 393.11(13).  The admitted person (or client advocate) may also challenge his or her support plan through Florida's administrative hearing process. § 393.0651(8).  An administrative hearing officer may not, however, amend or rescind the circuit court's order involuntarily assigning the individual to residential services.

## II.  BACKGROUND FACTS

The plaintiff ("J.R.") is a retarded 48-year-old male who reportedly has obsessive compulsive and psychotic symptoms.  Born in Tampa, Florida, he and his family relocated to the Fort Myers area when he was a child.  His parents are now deceased, but he still has siblings and other family members in the Fort Myers area.

After leaving his parents' home at the age of 16, J.R. reportedly worked as a migrant farm laborer and dishwasher at times.  He can read simple sentences but has

poor written skills.  He functions at a 7 year, 1 month level on the Vineland Adaptive

Behavior Scale and has a reported IQ of 56 (last tested on March 29, 2001).

In 2000, J.R. was charged in Lee County, Florida, with sexual battery.  In 2001,

after finding J.R. incompetent to stand trial, the Lee County Circuit Court involuntarily

committed J.R. to the custody of the Department of Children and Family Services

("DCF") for treatment in DCF's Mentally Retarded Defendant Program.  In 2004, lacking

evidence to suggest that J.R. would ever become competent to stand trial, the circuit

court dismissed the criminal charges against J.R. and—upon motion filed by J.R.'s

attorney—ordered J.R. admitted to "secure" residential services pursuant to section

393.11.  After learning that DCF recommended a non-secure rather than a secure

placement, the circuit court later changed its order, involuntarily admitting J.R. to "non-

secure" rather than "secure" residential services.  Without specifying any particular type

of residential setting, the court explained that the purpose of the ordered residential care

was to provide J.R. with vocational and social skills training.

J.R. has resided in the Positive Images Group Home ("PIGH") in Gainesville,

Florida, since he left DCF's custody in or about 2007.[3]  PIGH is a behavior focused

group home, whose staff members are specially trained to work with individuals who

display extreme and/or violent behaviors.  As required for all residents at a behavior

focused group home, a Certified Behavior Analyst ("CBA") was assigned to J.R. when

he arrived at PIGH.  J.R.'s CBA, Gregory Jansen ("Jansen"), is—and has been since

2007—responsible for assessing J.R.'s behavior and developing a behavior plan ("BP")

---

[3]  Gainesville is in Alachua County, Florida, which is in a different state judicial
circuit from Lee County.

based on that assessment.

At PIGH, residents may be supervised 24 hours a day, 7 days a week. According to Jansen, APD assesses on a semi-annual basis whether a resident's behaviors necessitate the level of training and supervision provided in a behavior focused group home. In 2007, an APD placement coordinator identified PIGH as the "only appropriate community placement available throughout the state" for someone with J.R.'s behavioral history.

The BP initially devised by Jansen placed significant restrictions on J.R's movements. The initial restrictions resulted, in part, from behaviors exhibited by J.R. when he first arrived at PIGH, including inappropriate touching of group home female staff and physical/verbal aggression towards staff members. In the years since 2007, as J.R.'s needs and behaviors have changed for the better, Jansen has repeatedly modified J.R.'s BP to reduce the restrictions imposed. J.R. must nonetheless comply with a number of group home rules and regulations, which include a curfew, a ban on alcohol consumption, and certain limitations on his freedom of movement.

Jordan Goldstein ("Goldstein") has been J.R.'s support coordinator since 2007. As defined in section 393.063, a "support coordinator" means:

> a person who is designated by [APD] to assist individuals and families in identifying their capacities, needs, and resources, as well as finding and gaining access to necessary supports and services; coordinating the delivery of supports and services; advocating on behalf of the individual and family; maintaining relevant records; and monitoring and evaluating the delivery of support and services to determine the extent to which they meet the needs and expectations identified by the individual, family, and others who participated in the development of the support plan.

§ 393.063(36). J.R.'s most recent support plan, dated February 1, 2012, was written by

Goldstein.  Among those who participated in the development of that support plan were

Goldstein, J.R., CBA Jansen, and attorney Katherine DeBriere ("DeBriere"), J.R.'s

counsel in this case.

The opening statement of J.R.'s 2012 support plan reveals that "[J.R.] would like

to move back to the Fort Myers area where his family lives."  As reported by Goldstein,

CBA Jansen recently submitted an updated BP in which he stated:

> The low frequency and intensity of [J.R.'s] behaviors and his ability to stay
> out of trouble with limited and covert supervision indicate that he would be
> able to maintain in a less restrictive setting such as Residential Habilitation
> group home as opposed to Behavior Focused (BF) group home he is
> currently residing at.

Doc. 41, Ex. 9, p.2.  Jansen recommended that J.R. be transitioned "to this less

restrictive setting in his hometown whenever such an opportunity becomes available."

Noting that APD's local review committee ("LRC") had approved Jansen's

recommendation, Goldstein concluded his 2012 support plan as follows:

> [J.R.'s] expressed desire is to live in the community independently and
> return to the Fort Myers to be near his family. [J.R.'s] SP [support plan]
> goals are in place to assist him in learning replacement behaviors
> consistent with his [BP] goals and his court ordered non secure residential
> placement at PIGH.  During the past year [J.R.] has demonstrated he is
> making progress towards his [BP] goals.  He has earned freedom of
> movement and has maintained a job for over a year with no reported
> inappropriate behaviors or incidents with the oversight of an SE coach.
> He reportedly is an excellent worker and has been offered relocation job
> opportunities [with] Steak and Shake in the Fort Myers area where [J.R.]
> desires to move to someday.  [J.R.'s] civil court case remains open in Lee
> county.  [J.R.] has legal representation to assist him in petitioning the court
> to allow him to return to the Fort Meyers area into a [less restrictive
> environment].  In the meantime [J.R.] is aware of his need to continue to
> make progress towards successfully completing his [BP] treatment goals
> and increasing his freedom of movement as a necessary step in
> promoting his independence.  His [BP] has been recently updated and
> approved by the LRC with the understanding that it will be submitted to the
> Court for review and a determination if he is to be reclassified by APD into

a less supervised more independent residential setting.  Pending further
court review of his progress, [J.R.] will continue in his behavior focus
[group home] placement at the PIGH.

Doc. 41, Ex. 9, p. 5-6.

According to both Goldstein and Jansen, J.R. is not free to simply move out of

the group home where he currently lives.  If he were to "elope," the police would

probably be called to return him to PIGH.  Moreover, any refusal on J.R.'s part to

comply with his BP or the group home rules could result in his losing the freedoms he

has so far gained.  With a serious violation of rules, he could be subjected to greater

supervision and/or a more restrictive placement.

Charles Ball, APD's Deputy Director of Budget and Planning, asserts that, when

a section 393.11 client refuses residential services "by not showing up and not following

the rules of the facility," the agency will file a notice, advising the circuit court that the

individual is refusing services.  Ball described a recent instance involving a man—not

J.R.—who repetitively eloped from his group home.  After the agency notified the circuit

court that the man was refusing services, the man was returned to court and there given

what Ball characterized as a "management lesson" by the judge.  The man thereafter

"substantially increased" his compliance with his residential services order.

Ball explained that an order under section 393.11 requires performance not only

by the person admitted to residential services but also by the agency that must provide

those services.  Without a release from the court, the agency cannot simply stop

providing required services.  If, based on the noncompliance of the client, the agency is

not capable of performing its obligations under the court's admission order,

then—according to Ball—the agency must be "proactive" in notifying—and seeking

further instruction from—the court.

While explaining that APD would need a release from the court before it could stop providing services altogether, Ball emphasized that the exact effect of an order under section 393.11 can be "substantially altered" over time.  That is, a person might be placed in the most restrictive setting initially but over time be graduated down to a very unrestricted setting, such as a foster home or an independent living setting.  In Ball's words: "So while [APD] cannot invalidate an order of the court, . . . the fact would be that the effect of the order would be appreciably diminished as long as the person's care plan was being carried out appropriately and their needs were being met."

The 2004 order entered by the Lee County Circuit Court involuntarily admitting J.R. to residential services did not specify or in any way limit the residential setting wherein J.R. is to receive those services.  The order simply states that J.R. is to be "involuntarily admitted to NON-SECURE residential services."  Doc. 44, Ex. 4 (emphasis in original).  Nonetheless, when Goldstein contacted Kerry Kahn, an APD employee who coordinates residential placements in the Fort Myers area, he (Goldstein) was told—incorrectly—that the "committing court" would have to approve a change in J.R.'s living arrangements before J.R. could move to Fort Myers.  Goldstein received a similar response from the office of Genie Rehak, DCF Assistant Regional Legal Counsel.[4]

In 2010, having been unsuccessful with his efforts—efforts begun in March of

---

[4]  Rehak's response was based, in part, on her communications with APD Supervising Attorney Julie Waldman.  By email to Rehak dated November 2, 2010, Waldman explained (without having seen the circuit court's order): "APD's position is that [J.R.] continues to need services and we are not filing petitions to change orders.  If he wants to change it, he will have to . . . pursue that.  He seems to be able to know who to contact for assistance."

2008—to get APD to move J.R. to Fort Myers, Goldstein began contacting law offices,

asking if they would assist with J.R.'s case.  After talking with public defenders in both

Fort Myers and Alachua County, a legal aid office in Fort Myers, and Three Rivers Legal

Services, Inc., all to no avail, Goldstein contacted Florida Institutional Legal Services,

Inc. ("FILS"), a non-profit law office located in Newberry, Florida.[5]  FILS attorney

DeBriere agreed to help J.R., not by filing a petition with the Lee County Circuit Court

seeking permission to move J.R. to a less restricted setting, not by filing a state court

habeas corpus action on J.R.'s behalf, but instead by filing this federal declaratory

judgment action, challenging the constitutionality of the statute invoked when J.R. was

involuntarily assigned to residential services.  In her response to the defendant's motion

for summary judgment, DeBriere explained:

> The reason current counsel took J.R.'s case was because FILS is a
> non-profit law office whose mission is to provide representation on cases
> that have the potential to impact more than just one person.  J.R.'s
> counsel has not filed a petition for habeas corpus because it agreed to file
> a federal lawsuit.  Unlike a petition for habeas corpus, this lawsuit fulfills
> FILS mission of providing the greatest potential impact for the largest
> number of people, namely all persons who are subject to involuntary
> commitment orders under § 393.11.

Doc. 46, p. 10.  Neither J.R. himself or anyone on his behalf has ever filed an

administrative action challenging J.R.'s support plan or a habeas corpus action

challenging his continued involuntary admission to residential services.

Attorney DeBrier filed this lawsuit on behalf of J.R. on August 25, 2011.  She

contends that section 393.11 violates due process because it does not require state-

---

[5]  By declaration, doc. 46-1, Goldstein stated: "In my experience, the people I serve as a support coordinator are not commonly able to obtain legal counsel.  The difficulty I experienced in trying to find counsel for J.R. supports this conclusion."

initiated periodic judicial review of J.R.'s involuntary admission to residential services. She seeks declaratory and injunctive relief as well as attorney's fees and costs.[6]

### III. ANALYSIS

J.R. contends that the procedures set forth in section 393.11 for continuing review of his involuntary admission to residential services are not adequate to shield him from the risk of an erroneous deprivation of his interest in being released from confinement.  J.R. suggests that, to comport with due process, the statute should require (1) state-initiated periodic judicial review by the entity—the circuit court—having sole jurisdiction to release an individual from an order entered pursuant to section 393.11; and (2) notification to the individual of his or her right to counsel and appointment of counsel if indigence is established.  According to J.R. the law as currently written falls short of constitutional standards because it places the burden on developmentally disabled persons to seek review of an admission order by petition for habeas corpus.  The court is not convinced.

The Due Process Clause of the Fourteenth Amendment to the United States Constitution provides that a state shall not "deprive any person of life, liberty, or property, without due process of law."  When a plaintiff asserts a denial of procedural due process, he must prove three elements: (1) a deprivation of a constitutionally-protected liberty or property interest; (2) state action; and (3) constitutionally-inadequate

---

[6]  DeBriere recently advised this court that APD has provided a residential referral packet to J.R., listing five group homes in or around Fort Myers, including three group homes that provide standard residential habilitation services.  Doc. 57.  J.R. has since moved to a group home that provides standard residential habilitation services in Port Charlotte, Florida, approximately thirty miles from Fort Myers, Florida.  J.R. has also chosen a new support coordinator who lives in the Fort Myers area.  Doc. 61.

process.  Grayden v. Rhodes, 345 F.3d 1225, 1232 (11th Cir. 2003).

The United States Supreme Court has repeatedly recognized that "civil commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection."  Addington v. Texas, 441 U.S. 418, 425 (1979) (citing cases). On its face, section 393.11 makes involuntary admission to residential services appropriate only (1) when "close supervision and habilitation in a residential setting" is needed to prevent a threat of substantial harm to a person lacking in basic survival and self-care skills, or (2) when a person "is likely to physically injure others if allowed to remain at liberty."  § 393.11(8)(b).  By its plain language, the statute makes loss of liberty a necessary concomitant to involuntary admission to residential services.  See Kinner v. State, 382 So. 2d 756, 760 (Fla. 2d DCA 1980) (recognizing that admission to services under section 393.11 constitutes a deprivation of liberty), rev'd on other grounds, 398 So. 2d 1360 (Fla. 1981).  J.R.'s case is no exception.  Indeed, the record amply demonstrates that J.R.'s involuntary assignment to a Gainesville-based behavior focused group home has resulted in a loss of J.R.'s liberty for due process purposes.[7] The first element of J.R.'s due process claim has been easily proved.

The second element—state action—has been easily proved as well.  Not only is an order by a state circuit court required before a person may be involuntarily admitted to residential services under section 393.11, but also a state agency—APD—is

---

[7]  APD makes much of the fact that J.R. was not "committed" to a state institution but was, instead, "assigned" to community-based residential services.  While the distinction may affect the degree of infringement, it does not alter the fact that J.R.'s liberty has been infringed by his involuntary assignment to a group home in a community where he does not choose to live.

responsible for providing the person so admitted with "the most appropriate level of care" in "the most appropriate, least restrictive, and most cost-beneficial environment for accomplishment of the objectives for client progress."  § 393.0651.

In deciding whether the third element—constitutionally-inadequate process—has been proved, the court must first determine what process is due to ensure that the state does not improperly curtail the liberty interests of persons, like J.R., who are involuntarily admitted to residential services.  The Supreme Court has long and often said that " 'due process is flexible and calls for such procedural protections as the particular situation demands.' "  Greenholtz v. Inmates of Nebraska Penal and Correctional Complex, 442 U.S. 1, 12 (1979) (quoting Morrissey v. Brewer, 408 U.S. 471, 481 (1972)).  In other words, "[w]hat process is constitutionally due cannot be divorced from the nature of the ultimate decision that is being made."  Parham v. J.R., 442 U.S. 584, 608 (1979).

Here, J.R. does not challenge the process used in the first instance to involuntarily admit persons to residential services pursuant to section 393.11.  Instead, he contends that the statute fails to provide a constitutionally-adequate procedure for reviewing the continued appropriateness, or lack thereof, of the confinements involuntarily imposed under the statute's authority.

It is well established that persons must be released from involuntary confinement once the grounds for initial confinement cease to exist.  See, e.g., O'Connor v. Donaldson, 422 U.S. 563, 574-75 (1975) (explaining that, "even if [the plaintiff's] involuntary confinement was initially permissible, it could not constitutionally continue after that basis no longer existed"); Jackson v. Indiana, 406 U.S. 715, 738 (1972)

(noting that "due process requires that the nature and duration of commitment bear
some reasonable relation to the purpose for which the individual is committed").  To
ensure release when release is merited, a number of courts have suggested that some
form of post-commitment periodic review is required.  See, e.g., Parham, 442 U.S. at
607 (noting that a person's continuing need for commitment must be reviewed
periodically by a neutral factfinder); Clark v. Cohen, 794 F.2d 79, 86 (3rd Cir. 1986)
(noting that due process requires periodic reviews of a patient's continuing need for
institutionalization by a hearing tribunal having the authority to afford relief).  What form
that periodic review takes may vary.  Compare Wyatt v. King, 773 F. Supp. 1508, 1516
(M.D. Ala. 1991) (concluding that mentally ill patients involuntarily committed to state
institutions are entitled to periodic judicial post-commitment review), with Williams v.
Wallis, 734 F.2d 1434, 1439 (11th Cir. 1984) (concluding that periodic nonadversarial
review by medical professionals satisfies due process where such professionals have
the authority to release insanity acquittees if and when they are found fit for release).

        In Williams, the Eleventh Circuit considered a due process challenge to
Alabama's procedures for the release of patients committed to the state's mental health
system after being acquitted of a criminal offense only by reason of insanity.  Every
person so committed to an Alabama mental hospital is assigned a treatment team
(consisting of a psychiatrist, a psychologist, a physician, a nurse, a social worker, and
other support personnel) that periodically (every 60-90 days) reviews the acquitee's
progress toward the treatment goal of transfer to a less restrictive environment and
eventual release.  The treatment team typically initiates the decision to release an
insanity acquitee.  The final decision regarding release is made by the hospital

superintendent.  While there is no formal policy allowing Alabama insanity acquittees to

seek judicial review of a hospital's release decisions, Alabama law provides that

persons confined as insane may seek release by filing a writ of habeas corpus.  In the

habeas proceeding, the patient must prove by a preponderance of the evidence that he

or she is no longer mentally ill and dangerous.  The Eleventh Circuit concluded that

Alabama's release procedures satisfied due process.

      In rejecting the plaintiff's argument that periodic adversary proceedings, rather

than periodic medical reviews, were required for due process purposes, the <u>Williams</u>

court explained that, if an adversarial atmosphere were imposed upon Alabama's

release procedures, it would likely undermine rather than aid the hospital's beneficial

goal of finding the least restrictive environment, leading to ultimate release, for the

committed insanity acquittees.  Unconvinced that Alabama's nonadversary release

procedures create an undue risk of erroneous deprivation of an insanity acquitee's

liberty interests, the Eleventh Circuit wrote:

> Hospitals and their medical professionals certainly have no bias against
> the patient or against release.  Therefore, we can safely assume they are
> disinterested decision-makers. In fact, the mental health system's
> institutional goal—i.e., transfer to a less restrictive environment and
> eventual release—favors release.  Other factors also favor release,
> including a perennial lack of space and financial resources, which militates
> against any motivation to unnecessarily prolong hospitalization, and
> including the medical professional's pride in his own treatment.  The
> frequency of the evaluations also reduces the risk that the patient will be
> confined any longer than necessary.

<u>Id.</u> at 1438.

      In <u>Parham</u>, the Supreme Court reviewed a Georgia law permitting a parent or

guardian to seek state-administered institutional mental health care for a minor child.

The Georgia law gives the state's regional mental hospitals the authority to admit a

minor child if, after observation, the hospital finds "evidence of mental illness" and

determines that the child is "suitable for treatment" in the hospital.  Against a due

process challenge, the Court upheld Georgia's nonadversarial procedures for admitting

a child to a state mental hospital for treatment.  In the Court's words:

> Due process has never been thought to require that the
> neutral and detached trier of fact be law trained or a judicial
> or administrative officer. . . . Surely, this is the case as to
> medical decisions, for neither judges nor administrative
> hearing officers are better qualified than psychiatrists to
> render psychiatric judgments.  Thus, a staff physician will
> suffice, so long as he or she is free to evaluate
> independently the child's mental and emotional condition and
> need for treatment.
>
> It is not necessary that the deciding physician conduct a
> formal or quasi-formal, hearing.  A state is free to require
> such a hearing, but due process is not violated by use of
> informal traditional medical investigative techniques. . . . The
> mode and procedure of medical diagnostic procedures is not
> the business of judges. What is best for a child is an
> individual medical decision that must be left to the judgment
> of physicians in each case. We do no more than emphasize
> that the decision should represent an independent judgment
> of what the child requires and that all sources of information
> that are traditionally relied on by physicians and behavioral
> specialists should be consulted.
>      . . . .
>
> Although we acknowledge the fallibility of medical and
> psychiatric diagnosis, we do not accept the notion that the
> shortcomings of specialists can always be avoided by
> shifting the decision from a trained specialist using the
> traditional tools of medical science to an untrained judge or
> administrative hearing officer after a judicial-type hearing.
> Even after a hearing, the nonspecialist decisionmaker must
> make a medical-psychiatric decision.  Common human
> experience and scholarly opinions suggest that the
> supposed protections of an adversary proceeding to
> determine the appropriateness of medical decisions for the

> commitment and treatment of mental and emotional illness
> may well be more illusory than real.

Parham, 442 U.S. at 607-609 (internal quotation marks and citations omitted); see also

Hickey v. Morris, 722 F.2d 543, 549 (9th Cir. 1983) (holding that periodic review of an

insanity acquittee's mental health by health professionals, rather than a court,

adequately protects the insanity acquittee's interest in regular review of his or her

continued confinement).

In deciding that the challenged procedures satisfied due process, the Supreme

Court in Parham and the circuit courts in Williams and Hickey applied the balancing test

articulated in Mathews v. Eldridge, 424 U.S. 319, 335 (1976). The Mathews Court held

that, when determining what procedures are required to minimize the risk of error when

liberty interests are at stake, a court must balance three factors:

> First, the private interest that will be affected by the official
> action; second, the risk of an erroneous deprivation of such
> interest through the procedures used, and the probative
> value, if any, of additional or substitute procedural
> safeguards; and finally, the Government's interest, including
> the function involved and the fiscal and administrative
> burdens that the additional or substitute procedural
> requirement would entail.

Id. at 335. Applying the Mathews test here, this court concludes that Florida's

procedures for the review and release of individuals admitted to residential services

pursuant to section 393.11 satisfy due process.

Unlike the plaintiffs in Parham, Williams, and Hickey, J.R. has not experienced

the very intrusive confinements of a state mental institution. He nonetheless has a

strong interest in avoiding confinement as an admittee to non-secure community-based

residential services. Stronger, however, is the state's interest in protecting the

community from a man who was charged with committing a sexual battery on a

developmentally disabled woman, whose mental retardation made him unable to

proceed to trial on that charge, and who—through his past conduct—has demonstrated

that he needs behavioral, vocational, and social skills training to allow him to safely

function in society.[8]

To balance these competing interests, the Florida Legislature enacted section

393.11, thereby fashioning a flexible alternative to existing state programs for the

treatment of individuals with developmental disabilities, programs "which often

unnecessarily place clients in institutions, are unreasonably costly, are ineffective in

bringing the individual client to his or her maximum potential, and are in fact debilitating

to many clients."  Fla. Stat. § 393.062.  Under section 393.11, APD is charged with the

continuing responsibility to see that all persons admitted to residential services are

placed "in the most appropriate, least restrictive, and most cost-beneficial residential

setting" for accomplishment of the objectives for client progress.  There is a wide range

of possible residential settings, from more intrusive to less intrusive, ranging from a

state-operated institution to locally-operated group homes to family and/or client

residences.  If, at any time, the behavioral specialists determine that a client is ready for

a more appropriate and less restrictive residential setting, APD has an affirmative duty

to effect—with the client's input—an appropriate change in placement.  Semi-annual

review by a CBA and annual review by a support team help to insure that clients are not

left in settings that are more restrictive than necessary.

_____

[8] In its order admitting J.R. to residential services, the court stated that "the
purpose to be served by residential care is vocational training and social skills training."

For developmentally disabled defendants who are continued in a secure facility pursuant to section 916.303(3), in lieu of placement in a non-secure setting pursuant to section 933.11, the Florida Legislature determined that court review is required "at least annually at a hearing."  In contrast, the Legislature deliberately chose not to require periodic judicial review of APD's decisionmaking pursuant to section 933.11, instead requiring nonadversarial annual review and revision of each client's support plan by at least one specialist knowledgeable about the appropriateness of any particular placement for any particular client.  There is nothing in this record to suggest that the specialists would have a bias against the clients.  In fact, the support coordinator who is responsible for annually reviewing and revising a client's support plan is a person designated by APD to "advocat[e] on behalf of the individual."  § 393.063(36).

As recognized by the Supreme Court, "[n]ot every determination by state officers can be made most effectively by use of the procedural tools of judicial or administrative decision-making."  Parham, 442 U.S. at 608 (internal quotation marks and citation omitted).  Indeed, it is doubtful that a nonspecialist judge or administrative hearing officer would be as well equipped as a behavioral specialist to determine what is the "most appropriate, least restrictive, and most cost-beneficial residential setting" for any particular client.  Here, given Florida's carefully-devised scheme for involuntarily admitting developmentally disabled persons to a flexible array of residential placements and services, the added requirement of state-initiated periodic judicial review of every client's case—with lawyers involved—would likely add a cumbersome and costly step that would hinder rather than aid the state's goal of getting each client into the most appropriate and least restrictive environment in a timely manner.  See Parham, 442

U.S. at 608 n.16 (noting that "[t]he judicial model for factfinding for all constitutionally protected interests, regardless of nature, can turn rational decisionmaking into an unmanageable enterprise").

The Lee County Circuit Court's order in this case did not specify any particular residential setting for J.R., leaving APD with the decision as to "the most appropriate, least restrictive and cost-beneficial residential setting" for J.R.'s particular needs.  The order also placed no restrictions on APD's ability to move J.R. from one setting to another as J.R.'s conduct and needs changed.  Consistent with the court's order, and based on the relevant examinations, evaluations, and recommendations, APD initially placed J.R. in a behavior focused group providing 24-hour-7-day-a-week supervision. Since his initial admission to that home, J.R.'s behavior has been closely monitored by a certified behavior analyst and a support coordinator, both of whom are required to review J.R.'s progress on a periodic basis.  J.R.'s support coordinator is required to revise J.R.'s support plan annually, after review and consultation with J.R. and other support plan participants, including J.R.'s CBA.  According to CBA Jansen, APD assesses on a semi-annual basis whether the frequency and/or intensity of an client's behaviors necessitates the level of training and supervision provided in a behavior focused group home.  Based on J.R.'s compliance with his BP, Jansen recently recommended that J.R. be moved to a regular "residential habilitation" group home that does not provide an intensive level of treatment or supervision.  Jansen's recommendation was accepted by J.R.'s support coordinator, was approved by APD's local review committee, and was acted upon—perhaps more slowly than necessary—by APD.  J.R. has now moved to a less restrictive group home environment closer to his

family, where he continues to receive services as needed.

While APD has the authority—indeed, duty—to move a section 393.11 client from a more restrictive to a less restrictive residential setting as circumstances dictate, only the circuit court has the authority to release an individual from an order under section 393.11.  J.R. contends that state-initiated periodic review by the circuit court is required for due process purposes simply because the circuit court, and only the circuit court, has that final authority.  This court thinks not.

While section 393.11 contains no provision *expressly* describing APD's responsibilities should the time come when a developmentally disabled client no longer satisfies the involuntary admission requirements, the statute can and should be read to *imply* an obligation on the part of APD to petition the circuit court to end the "hold" on an client who is no longer deemed to be a danger to himself or others.  The circuit court's order, after all, binds not only the client who is admitted to residential services but also the agency that is required to provide the ordered services.  If APD were to determine that a client had reached the point of no longer meeting the involuntary admission requirements, the agency could not on its own authority cease to provide those services.  Instead, acting in its own best interests as well as those of the individual the agency was ordered to serve, APD would have to petition the appropriate circuit court for an order releasing the agency from its responsibility to provide those services and, at the same time, releasing the client from the order of involuntary admission.  If, for whatever reason, APD failed to seek a client's release from an involuntary admission no longer deemed necessary, or if the client were to disagree with an agency assessment that release would not be appropriate, then—as a safeguard—a petition for writ of

habeas corpus may be filed "[a]t any time and without notice" by or on behalf of the client.

J.R.'s counsel suggests that it is "fundamentally unfair" to expect a man with mental retardation to "be able to navigate the complex process of seeking judicial review on his own."  To be sure, "review procedures must be tailored to the capacities and circumstances of those who are to be heard," Goldberg v. Kelly, 397 U.S. 254, 269 (1970); and J.R.'s mental retardation and educational level make it unlikely that he will be able to petition the court on his own.  It must be remembered, however, that, under section 393.11, petitions to an administrative hearing officer (in case of disagreement over the terms of a support plan) or to the circuit court (in case of disagreement over release eligibility) are backup measures intended to safeguard against agency errors, inattention, or inaction.  If, because of his or her mental retardation and educational limitations, a client is unable to petition the courts on his or her own, family members, an advocate, or a support coordinator may be able to either find counsel for the client[9]  or help the client draft a letter to the court asking for the appointment of counsel.

IV. CONCLUSION

Supreme Court Justice Bushrod Washington long ago wrote:

> It is but a decent respect due to the wisdom, the integrity, and the patriotism of the legislative body, by which any law is passed, to presume in favour of its validity, until its violation of the constitution is proved beyond all reasonable doubt. This has always been the language of this Court, when that subject has called for its decision; and I know that it expresses the honest sentiments of each and every member

---

[9]  In J.R.'s case, his support coordinator was able, albeit with difficulty, to find counsel to assist J.R. with court interaction.

of this bench.

Ogden v. Saunders, 25 U.S. 213, 270 (1827); see also Davis Warehouse Co. v. Bowles, 321 U.S. 144, 153 (1944) (stating that "State statutes, like federal ones, are entitled to the presumption of constitutionality"); Kinner, 398 So. 2d 1360, 1363 (Fla. 1981) (recognizing that "all doubt will be resolved in favor of the constitutionality of a statute, and that an act will not be declared unconstitutional unless it is determined to be invalid beyond a reasonable doubt").

Here, the Florida Legislature has fashioned what, in essence, is a nonadversarial scheme that (1) allows section 393.11 clients and their family members or advocates to provide input into the development and annual revision of support plans that detail "the most appropriate, least restrictive, and most cost-beneficial environment for accomplishment of the objectives for client progress and a specification of all services authorized," § 393.0651; (2) authorizes APD—through the advice of specialists and without court involvement—to decide what is the "the most appropriate, least restrictive, and most cost-beneficial environment" suitable for a client's individual needs and behaviors; (3) authorizes APD—with client input and without court approval—to move a client to progressively less restrictive environments as the client's needs and behaviors change; and (4) places an implicit burden on APD, rather than the client, to petition the court for release from an order of involuntary admission when the conditions for release are indicated.  Under this scheme, the behavioral specialists are given the flexibility to perform the tasks and make the decisions for which they were trained, without having to spend the time needed to prepare for and perhaps participate in periodic court

proceedings.[10]  See Parham, 442 U.S. at 605 (noting that "[b]ehavioral experts in courtrooms and hearings are of little help to patients").  Parham, 442 U.S. at 605. Because specialists as well as APD representatives are not infallible, however, the Legislature has provided the means by which judicial review may be sought when and if needed.

Having carefully reviewed the terms of the statute as well as the particular circumstances of J.R.'s situation, the court is convinced that section 393.11 passes muster under the Due Process Clause.  Accordingly, it is ORDERED:

1.  J.R.'s motion for summary judgment (doc. 41) is DENIED.

2.  J.R.'s request for oral argument (doc. 43) is DENIED.

3.  The defendant's motion for summary judgment (doc. 44) is GRANTED.

4.  The clerk shall enter judgment stating: "All claims are DISMISSED with prejudice."

DONE AND ORDERED this ____22nd____ day of ___May___, 2012.


s/ William Stafford_____
WILLIAM STAFFORD
SENIOR UNITED STATES DISTRICT JUDGE

---

[10]  The court is mindful that, even if periodic judicial review were required, the circuit and administrative courts are likely to defer to the opinions expressed by the specialists having knowledge about the needs and behaviors of the clients.